1

2   **E-Filed 3/4/10**

3

4

5

6

7

8       IN THE UNITED STATES DISTRICT COURT

9       FOR THE NORTHERN DISTRICT OF CALIFORNIA

10      SAN JOSE DIVISION

11

12   | | |
13   IN RE EBAY SELLER ANTITRUST        Case Number C 07-01882 JF (RS)
     LITIGATION
14                                       ORDER[1] GRANTING DEFENDANT'S
                                         MOTION FOR SUMMARY
15                                       JUDGMENT AND DENYING AS
                                         MOOT PLAINTIFFS' MOTION FOR
                                         CLASS CERTIFICATION
16
                                         [re: docket nos. 217, 397]
17

18

19

20          Plaintiffs, on behalf fo themselves and a putative class, assert claims against Defendant

21   eBay, Inc. ("eBay") pursuant to § 2 of the Sherman Antitrust Act ("Sherman Act") and §§ 1620

22   & 17200 of the California Business & Professional Code.  The operative complaint asserts six

23   claims: (1) abuse of monopoly power and monopoly maintenance for online auctions; (2)

24   attempted monopolization of the market for online auctions; (3) abuse of monopoly power and

25   monopoly maintenance in the market for person-to-person online payment systems; (4) attempted

26   monopolization of the market for person-to-person online payment systems; (5) unlawful trust,

27   ────────────────

28   [1] This disposition is not designated for publication in the official reports.

combination, or conspiracy in restraint of trade and commerce; and (6) unfair business practices.[2] On December 1, 2009, after extensive discovery over a period of more than two-and-a-half years, the Court heard argument on Plaintiffs' motion for class certification and Defendant's motion for summary judgment. For the reasons set forth below, the Court will grant the motion for summary judgment and deny as moot the motion for class certification.

## I. BACKGROUND

Unless otherwise indicated, the following facts are undisputed for the purpose of the instant motions.

### A.    eBay's Business Model

eBay is a well-known online marketplace for the sale of goods and services. eBay's website facilitates exchanges between prospective buyers and sellers listing items for sale. Originally, eBay was designed solely as an auction platform where buyers could bid for and purchase a range of products offered by sellers. However, after the company went public in September 1998, it expanded by adding a hybrid feature called "Buy It Now" in 2000 and a fixed price format in 2002.

The fees eBay charges for all of its services, including the auction format, are listed and published in its "rate cards." For the online auction format, sellers' fees depend on the initial listing price for a product ("insertion fee") and final value of the item sold ("final value fee"). Ranges for insertion fees and final value fees are listed on the rate card. The rate card is applicable uniformly to all eBay sellers.

### B.    PayPal

In July 2002, eBay purchased PayPal for $1.5 billion. Paypal is an online payment system that enables individuals and businesses to send and receive payments online by means of credit cards and bank transfers. Such systems are known as person-to-person ("P2P") online payment systems. PayPal users set up accounts that can be funded by the user's credit card or by an

---

[2]In an order dated March 4, 2008, the Court dismissed a seventh claim alleging *per se* unreasonable tying under §1 of the Sherman Act.

electronic debit from a bank account and can either establish a PayPal deposit account or receive payments through electronic transfer or checks from PayPal. Though PayPal provides the preferred payment method on eBay, it serves many other companies and institutions as well.

The Named Plaintiffs in this action are three individuals[3] who sell products actively through eBay's online marketplace and seek to represent a class of all auction sellers on eBay and a subclass of all auction sellers on eBay who accept PayPal.

## C.    Other eBay Acquisitions

- In 1999, prior to acquiring PayPal, eBay acquired Billpoint, another online payment system company. eBay publicly launched Billpoint in March 2000. Billpoint was shut down following eBay's acquisition of PayPal in 2002.

- In August 2004, eBay purchased a twenty-five percent interest in Craigslist, a provider of online classified advertisements.

- In the fall of 2005, eBay acquired VeriSign's payment gateway business for $370 million. At the time, "Verisign's network had the most active online merchants using its payment service to transact sales online–112,000 in 2004." (Pls.' Mot. for Class Cert 16 (citing Friedman Decl. Ex. 55 at 611).)

- In October 2008, eBay acquired BillMeLater, "an online transactional credit service that instantaneously provides consumers with credit on a transaction-by-transaction basis for online purchases." (*Id*. at 17 (citing Friedman Decl. Ex.62).)

## D.    eBay Agreements

- Since 1997, eBay has entered into a series of agreements with America Online ("AOL"), a global internet services and media company. By 1999, the operative agreement provided for payment of $75 million by eBay to AOL to establish eBay as the exclusive auction site on AOL.

- In May 2006, eBay and Yahoo!, Inc., an internet services company, agreed to form

---

[3]A fourth individual, James Donohue, voluntarily dismissed his claims without prejudice.

Case No. C 07-01882  JF (RS)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
(JFLC3)

a strategic partnership.  Among other things, the agreement established eBay as the exclusive third-party provider on Yahoo! Wallet, the payment system used by Yahoo! for its various services.

- In August 2006, eBay entered into an international agreement with Google that provided that Google would be the exclusive text-based advertising producer for eBay outside the United States and that eBay and Google would integrate and jointly launch a "click-to-call" advertising platform.

**E.    PayPal and the Online P2P Payment System Competition**

In July 2006, eBay added Google's payment service, Google Checkout, to the list of online payment methods not permitted on eBay.  This list includes other online payment services such as alertpay.com, sendmoneyorder.com, and Moneygram.com.  Use of one of the prohibited services can result in listing cancellation, forfeiture of eBay fees on cancelled listings, limits on account privileges, loss of earned seller status on eBay, or suspension of the user's eBay account. In October 2008, eBay changed its policy to prohibit sellers from accepting any form of paper payment, such as cash, cashier's checks, and money orders.

eBay also has changed its online payment policies by reducing the monthly limits on less expensive personal (as opposed to merchant) PayPal accounts, offering buyer protection only for PayPal users, requiring sellers with PayPal accounts to offer and accept all payment options (including credit card transactions), and requiring sellers registering after January 2007 to offer PayPal or have an alternate merchant credit card account.

## II.  DISCUSSION

**A.    Motion for Summary Judgment**

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those that might affect the outcome of the case under the governing law.  *Id.* at 248.  There is a genuine dispute about a material fact if there is sufficient evidence for a reasonable jury to return a verdict

for the nonmoving party. *Id.* The moving party bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the party moving for summary judgment would not bear the ultimate burden of persuasion at trial, it must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden, the burden shifts to the nonmoving party to present specific facts showing that there is a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

The evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Summary judgment thus is not appropriate if the nonmoving party presents evidence from which a reasonable jury could resolve the material issue in its favor. *Liberty Lobby*, 477 U.S. at 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

eBay moves for summary judgment as to each of Plaintiffs' claims.

**1.    Monopolization and Attempted Monopolization of the Online Auction Market Under § 2 of the Sherman Act**

"To prevail on a claim of monopolization under Section 2 of the Sherman Act, a plaintiff must demonstrate: '(1) [p]ossession of monopoly power in the relevant [market or] submarket; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury.'" *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997) (citing *Pac. Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir. 1992), *cert. denied*, 506 U.S. 1034 (1992)). Similarly, to prevail on a claim of attempted monopolization under Section 2, "a plaintiff must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anti-competitive conduct directed toward accomplishing that purpose; (3) a dangerous probability

5

of success; and (4) causal antitrust injury." *Id.* at 1477 (citing *Rebel Oil Co., v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995)).

eBay moves for summary judgment as to all of Plaintiffs' Section 2 claims involving eBay's online auction platform on the grounds that: (1) Plaintiffs improperly define the relevant market; (2) eBay does not have monopoly power in a properly defined market; and (3) Plaintiffs have failed to demonstrate causal antitrust injury.

### a.    Monopoly Power and Relevant Market Definition

Plaintiffs bear the burden of proving that eBay has monopoly power. Monopoly power[4] is "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).

> A plaintiff may demonstrate market power either by direct evidence or by circumstantial evidence. Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices. Such a showing "is direct proof of the injury to competition which a firm with market power may inflict, and thus, of the actual exercise of market power."

*Forsyth*, 114 F.3d at 1475 (citing *Rebel Oil Co.*, 51 F.3d at 1434) (internal citations omitted). Only when there is a failure of direct proof must the plaintiff provide circumstantial evidence, which requires defining the relevant market. *Id.* at 1476.

### i.    Direct Evidence of Market Power

Plaintiffs contend that they have presented sufficient direct evidence of eBay's market power in the online auction market. First, they claim that the record contains empirical evidence

---

[4]"The Ninth Circuit Court of Appeals and the district courts of the Ninth Circuit have routinely treated 'monopoly power' and 'market power' as synonymous terms in the context of a § 2 Sherman Act claim." *IGT v. Alliance Gaming Corp.*, No. 2:04-CV-1676-RCJ-RJJ, 2008 WL 7071468, at *10 (D. Nev. Oct. 21, 2008); *see, e.g.*, *United States v. LSL Biotechs.*, 379 F.3d 672, 696 (9th Cir.2004) ( "The power relevant to antitrust is market power, or as some economists put it 'monopoly power.'"); *Image Technical Servs., Inc. v. Wash. Natural Gas Co.*, 99 F.3d 937, 950 n.15 (9th Cir. 1996) (stating, in a § 2 action, that "[t]he terms 'market power' and 'monopoly power' are used interchangeably herein"); *Cyntegra, Inc. v. Idexx Laboratories, Inc.*, 520 F. Supp. 2d 1199, 1209 (C.D. Cal.2007) ("The first element of a § 2 claim requires monopoly power (also known as market power), which is 'the power to control prices or exclude competition.'").

that eBay behaves as a monopolist in the online auction market. They cite the findings of The Parthenon Group, a consulting service hired by eBay to examine price elasticity on its marketplace platform, as proof that eBay's fees for its online auction services are monopolistic. Specifically, Plaintiffs point to Parthenon's finding of a -1.0 price elasticity for the online auction format. They contend that Parthenon's finding that elasticities for the auction platform are different from those for the fixed-price platform demonstrates market power in the online auction format, because that difference "would not persist if sellers and buyers viewed the[] two platforms as close substitutes." (Pls.' Opp'n to Def.'s Mot. for Summ. J. ("MSJ") 5.)

Second, Plaintiffs argue that eBay's maintenance or increase of its price levels throughout the class period and eBay employees' recognition of eBay's ability to do so constitute direct evidence of market power. Third, Plaintiffs assert that other empirical evidence in the record demonstrates low cross-elasticity of demand between online auctions and fixed-price transactions. Plaintiffs' expert, Dr. Glenn Woroch ("Woroch"), examined data on a sale on fixed-price fees in July 2008. According to Woroch, "[i]f the two formats were close substitutes, auction listings would fall significantly as sellers shift to the temporarily lower fixed-price format." (Pls.' Opp'n to Def.'s MSJ 6.) However, Woroch concluded that the data showed no such change; Plaintiffs contend that this shows that the two formats are not economic substitutes for one another.

Fourth, Plaintiffs claim that The Parthenon Group's analysis of own-price elasticity of demand is further evidence of eBay's market power in online auctions. While Woroch asserts that own-price elasticity should not differ if auctions and fixed-price listings are close substitutes, The Parthenon Group's data show that own-price elasticity does differ between the formats.

eBay offers two principal arguments in response. First, it contends that Plaintiffs incorrectly define "market power." Second, it asserts that both Plaintiffs and Woroch misinterpret their own evidence, and that Plaintiffs define the concept of market power too broadly. In his declaration in opposition to eBay's motion for summary judgment, Woroch states:

I do not draw conclusions about whether eBay has *monopoly* power in any market, which I understand to mean it would have the ability to exclude all, or nearly all, competitors from those markets. My analysis is limited to the determination of *market* power by which I mean the ability to raise price above the competitive level.

(Woroch MSJ Opp'n Decl. 2 n.3 (emphasis in original).) eBay contends that Woroch's definition equates market power with "the power over price possessed by every producer of a non-fungible good," a formulation that has been rejected explicitly in the antitrust literature. Instead, relying upon Judge Posner's treatise on the subject, eBay argues that "'market power' in an exclusionary conduct case means something close to monopoly power." (Def.'s MSJ Reply 17 (citing Richard A. Posner, *Antitrust Law* 195 (2d ed. 2001)).) According to eBay, Judge Posner has warned against adopting the definition used by Woroch precisely because "even firms 'in highly competitive markets will often have some power over price as long as they are not selling a fungible commodity.'" (*Id.* (citing Posner, Antitrust Law 195).)

eBay also challenges Plaintiffs' empirical evidence. Among other things, it argues that Plaintiffs' reliance on own-price elasticity is misplaced. In the opinion of eBay's expert, Dr. Kevin Murphy ("Murphy"), "a finding of -1.0 price elasticity is simply a reflection of the fact that eBay's marginal costs are approximately zero, and that it 'tells us nothing about the level of competition. . . . If marginal costs are zero, 100% of any price is a markup, no matter what the level of price.'" (*Id.* (citing Murphy Supp. Decl. ¶¶ 42, 44).) In addition, eBay argues that Woroch misinterprets the results of the July 2008 sale on fixed-price fees. According to eBay, Woroch's own analysis "show[s] that auction listings *did* in fact fall by 3.44% during the fixed price insertion fee sale, based on just two days of listing data (one before the sale and one during)" (*Id.* at 18 (citing Woroch MSJ Decl. Ex. 2) (emphasis in original)) and that the formats thus are substitutes for one another.

Viewing the evidence in the light most favorable to them, the Court concludes that Plaintiffs have failed to show "direct evidence of the injurious exercise of market power" from the facts in the record. As discussed above, the Ninth Circuit has recognized that market power "may be shown by evidence of restricted output *and* supracompetitive prices." *Forsyth*, 114 F.3d

8

at 1475 (emphasis added).  Evidence that eBay has raised prices over a period of years, and that several of its employees believe that the company may have raised them too high, proves nothing with respect to whether the prices are supracompetitive. Plaintiffs have provided no evidence of either restricted output or supracompetitive prices, let alone both.  *See, e.g.*, *id.* at 1476 (holding that "plaintiffs have failed to present direct evidence of market power" where they submitted evidence of supracompetitive prices but made "no accompanying showing of restricted output").  Nor have Plaintiffs cited any authority for the proposition that the type of evidence they have provided constitutes direct proof of market power.[5]

### ii. Circumstantial Evidence of Market Power

While antitrust plaintiffs are permitted to present direct evidence of a defendant's market power, "[t]he more common type of proof is circumstantial evidence pertaining to the structure of the market."  *Rebel Oil Co.*, 51 F.3d at 1434.  To meet their burden with circumstantial evidence,  Plaintiffs must "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."  *Id.*  eBay argues that Plaintiffs have failed to define the relevant market correctly or to show, when the market is defined correctly, that eBay has a dominant share of the market.

### (1) Defining the Relevant Market

Market definition is a threshold issue.  Resolution of Plaintiffs' claims both for monopolization and for attempted monopolization is "dependent upon a definition of the relevant market.  Without such a determination, [a court] cannot assess whether challenged activity was anticompetitive."  *Forsyth*, 114 F.3d at 1477; *see also id.* at 1476 ("It is impossible to determine market share without first defining the relevant market.").  As the Ninth Circuit has held:

> Definition of the relevant market cannot be performed with mathematical

---

[5]eBay raises evidentiary objections to certain documents cited in Plaintiffs' opposition papers as direct evidence of market power.  Because the Court concludes that Plaintiffs have failed to show that there is a triable issue of fact even with the contested evidence, the objections are moot.

9

accuracy; it is simply the recognition of a field in which meaningful competition is said to exist. We have previously defined the relevant market as the group of sellers or producers who have the "actual or potential ability to deprive each other of significant levels of business."

*Id.* at 1476 (citation omitted). Put another way, "[t]he product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th 2001) (citation omitted).

eBay argues that Plaintiffs' proffered "online auctions market" is not a proper relevant market because it does not include all reasonably interchangeable substitutes. It points to evidence in the record that the named Plaintiffs as well as other eBay buyers and sellers substitute regularly among online auctions and other sales platforms and that its online auction format is priced competitively both with its own fixed-price platform and with Amazon, its fixed-price competitor.

Plaintiffs do not dispute eBay's claim of competitive pricing, relying instead upon *Brown Shoe, Inc. v. United States*, 370 U.S. 294, 325 (1962). In *Brown Shoe*, the Supreme Court held that "within [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes" and that "[t]he boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325. Plaintiffs contend that application of *Brown Shoe*'s "practical indicia" leads to the conclusion that the online auctions market is an economically distinct submarket within the broader category of online marketplaces.[6]

---

[6]eBay objects to each document cited by Plaintiffs in support of the *Brown Shoe* factors. eBay asks that the documents be excluded or, in the alternative, that eBay be given the opportunity to supplement some of them to put the documents in context, on one or more of the following grounds: relevance, authentication, inadmissible hearsay, or lack of context.

The objections are overruled. Each of the documents cited meets the relevance standards of Rules 401 and 402. Similarly, the statements challenged as hearsay either are not offered for the truth of the matters asserted; are admissions by eBay, its employees, or its agents within the scope of the employment or agency; or are admissible under Rule 803. (cont. on next page)

## Industry or Public Recognition

According to Plaintiffs, the record demonstrates that eBay employees, industry analysts, potential competitors such as Yahoo!, and internet bloggers all recognize the online auction market as a separate economic entity distinct from the fixed-price format. However, eBay points to Woroch's acknowledgment in his deposition testimony that such evidence "is not germane to defining the relevant market for antitrust purposes." (Def.'s MSJ Reply 11.)

## Peculiar Characteristics or Uses

Plaintiffs contend that eBay's online auctions possess several characteristics and uses that make them distinct from fixed-price sales. First, they cite record evidence that online auctions are "particularly useful to enable a market for hard-to-find or unique types of goods, different from goods that are commodity-type goods." (Pls.' Opp'n to MSJ 11.) Second, they highlight the lack of time constraints for online auctions in comparison to offline auctions and transactions with traditional retailers. Third, they note that online auction sellers and buyers face minimal geographical constraints, as nearly all of the transactions that occur on eBay are not local. Fourth, they argue that online auctions offer a unique and fun experience to buyers and sellers distinct from other sales formats.

While conceding that the online auction format may be unique, eBay disagrees strongly that the format represents a separate market for antitrust purposes. It argues that market definition is controlled by "commercial realities," as demonstrated by consumer behavior, and it cites unambiguous evidence in the record–particularly the testimony of the Named Plaintiffs that the relevant market for eBay sellers includes alternatives to the online format.

---

The documents all are properly authenticated either by virtue of their production by eBay or by a third party pursuant to discovery requests in this litigation, their publication in newspapers or periodicals, their issuance as official government reports, or through the submission of a voice recording. While Rule 106 allows eBay to supplement the record with material it believes should be taken into consideration contemporaneously with any of Plaintiffs' submissions, it has not done so.

11

Case No. C 07-01882  JF (RS)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
(JFLC3)

## Unique Production Facilities

Plaintiffs claim that because eBay provides a service or venue rather than goods, the question of whether eBay has unique production facilities is irrelevant to market definition. eBay contends that Plaintiffs ignore this factor because it weighs against them. It notes that "eBay online auctions were born from a computer and internet connection, just like the services provided by, among others, Amazon.com, Craigslist, and Google that Plaintiffs place outside their relevant market." (Def.'s MSJ Reply 13.)

## Distinct Customers

Plaintiffs assert that online auctions have distinct customers–both buyers and sellers. First, they contend that eBay's auction platform is dominated by a "core group of consumer sellers," the majority of whom, as shown by eBay's own marketing studies, sell exclusively on eBay. Second, they point to eBay survey data from 2005 showing that more than half of eBay buyers bought exclusively on the auction format while only twenty percent bought from both the fixed-price and auction formats. Third, they refer to comments by eBay employees about eBay sellers as evidence that sellers are captive to eBay because of a lack of viable alternatives. Fourth, they offer eBay corporate documents to prove that the alternatives to eBay's auction format that do exist–Amazon, Craigslist, and Overstock–are not genuinely close substitutes.

eBay points to evidence in the record showing that its buyers and sellers do not specialize in one format or another, either online or offline, and that, in fact, twenty-seven percent of online auctions are listed simultaneously in the fixed price format. eBay also disputes Woroch's finding that there is only small percentage of overlap between eBay's auction and fixed-price listings and claims that, when the statistics relied upon by Woroch are analyzed correctly, the overlap actually is eighty percent.

## Distinct Prices

Plaintiffs argue that sales on eBay's auction platform have distinct prices (i.e., fees) that eBay itself has recognized are not competitive with alternatives. Plaintiffs attribute the similarities between pricing for the fixed-price and auction formats in previous years to "the

12

historical development of eBay's business model rather than the conclusion that eBay's auction fee levels were competively restrained by fixed-price platforms" and point to evidence that in October 2008 "eBay finally responded to the fixed price competitive landscape by only reducing its fees for fixed-price sales, while leaving auction fee levels unchanged." (Pls. Opp'n to Def.'s MSJ 18.)

eBay notes that its fees for the auction and fixed-price formats have been the same for the majority of the class period, and it also argues that "as a matter of law, price differences do not establish the existence of separate product markets, when, as here, price varies along with product characteristics." (Def.'s MSJ Reply 14.) Citing authority from this district, eBay contends that "[c]ourts have repeatedly rejected efforts to define markets by price variances or product quality variances. Such distinctions are economically meaningless where the differences are actually a spectrum of price and quality differences." *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988).

**Sensitivity to Price Changes**

Reasserting their earlier arguments with respect to elasticity of demand, Plaintiffs contend that this factor weighs toward finding a submarket of online auctions. eBay again asserts that Woroch's analysis of the fixed-price fee sale actually shows that auction sellers are sensitive to changes in price. eBay also relies on the deposition testimony of Ann Farmer, one of the Named Plaintiffs, who testified that price increases for auction listings induced her to choose the fixed-price format instead. (Farmer June 3, 2009, Dep. 31:14-23.)

**Specialized Vendors**

Plaintiffs contend that this factor favors finding a submarket for online auctions because the auction platform, which "connects millions of sellers to millions of buyers to engage in online auctions," (Pls.' Opp'n to Def.'s MSJ 9), is a "specialized method of retailing distinct from other conventional methods." *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 714 (7th Cir. 1979). Plaintiffs emphasize that eBay's marketplace is different from that used by traditional retailers because eBay never takes possession or ownership of the products sold.

1    While it agrees that it offers a unique way of retailing, eBay points out that its

2    "specialized method" applies equally to its fixed-price format, in that eBay never takes

3    ownership of the products sold through either format.

4        **Summary**

5        The Ninth Circuit has held that the *Brown Shoe* factors are

6        practical aids for identifying the areas of actual or potential competition and that
         their presence or absence does not decide automatically the submarket issue.
7        [citations omitted]  Whether isolating a submarket is justified turns ultimately
         upon whether the factors used to define the submarket are "economically
8        significant." [citation omitted]

9    *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1375 (9th Cir. 1989).

10       In *Thurman Industries*, the plaintiff competitor alleged that the defendant retailer

11   exercised market power in a submarket comprised of "home center" retail stores.  Relying upon

12   *Brown Shoe*, the plaintiff argued that home center stores were specialized vendors, that they

13   catered to distinct customers known as "do-it-yourselfers," that they were recognized in the

14   industry as a discrete product market, and that consumers recognized them as a discrete

15   submarket.  In rejecting plaintiffs' market definition, the Ninth Circuit held that:

16       [t]he factors advanced by Thurman represent but two fundamental
         assumptions of fact: (1) that home centers are perceived as distinguishable from
17       other stores by the variety of products and the trained sales staffs that home
         centers offer, and (2) that customers engaged in major home remodeling or home
18       repair projects patronize home centers because of this distinction.  But these
         factual assumptions, even if true, form an inadequate basis for concluding that
19       home centers and other retailers lack the ability to attract substantial amounts of
         business away from each other.  Stated more concretely, the factors identified by
20       Thurman are wholly inadequate to allow a finding that specialty stores selling
         house paint are unable through price reductions or other marketing strategies to
21       lure significant numbers of do-it-yourself builders into buying paint at a specialty
         store even if they purchase all their other supplies at a home center.  This analysis
22       applies with equal force to the marketing overlap of all other products sold both
         by home centers and by other retailers.

23

24   *Id.* at 1376.

25       Here, however, Plaintiff's evidence with respect to the *Brown Shoe* indicia is at least

26   sufficient to create a triable issue of fact as to whether other, non-auction platforms have "actual

27   or potential ability to deprive [providers of online auction formats] of significant levels of

28

14

business." *Id.* at 1374 (citation omitted). Many of eBay's challenges to Plaintiffs' factual showing go to the weight rather than the materiality or legal sufficiency of the evidence. Market definition "is a factual inquiry for the jury; the court may not weigh evidence or judge witness credibility." *Id.* (citation omitted).[7]

### (2) Ownership of a Dominant Share of the Market

A determination as to whether eBay owns a dominant share of the market obviously depends on the definition of the relevant market. In this instance, each party has presented evidence of eBay's market share using its own definition. Accordingly, because it concludes that Plaintiffs' have presented evidence sufficient to raise a triable issue of fact as to their proposed market definition, the Court also concludes that Plaintiffs have demonstrated a triable issue of fact with respect to whether eBay controls a dominant share of that market. Indeed, eBay does not dispute Plaintiffs' assertion that it owns between eighty and ninety-nine percent of the online auction market. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of

---

[7]In response to eBay's reliance on the experience of the individual Named Plaintiffs, Plaintiffs argue that the substitutability of products should be viewed in the aggregate rather than at the individual level. To support this contention, Plaintiffs rely upon the decision of the District of Columbia Circuit in *F.T.C. v. Whole Foods*, 543 F.3d 1028 (D.C. Cir. 2008). That case held that "in some situations core consumers, demanding exclusively a particular product or package of products, distinguish a submarket." *Id.* at 1041. Plaintiffs contend that with online auctions, as with the speciality grocery stores at issue in *Whole Foods*, the existence of "fringe customers" who may not use the format exclusively does not defeat the existence of a submarket. Plaintiffs also claim that economic theory typically calculates cross-elasticity of demand in the aggregate rather than at the individual level.

eBay argues that *Whole Foods* is inapposite because, unlike the FTC, Plaintiffs have provided no evidence that eBay has discriminated against any online auction users, let alone users Plaintiffs would consider to be in the "core" subset for whom online auctions have no substitute. eBay also argues that the testimony of all three Named Plaintiffs demonstrates that none of them is a member of Plaintiffs' proposed "core" of eBay sellers and thus none of them has standing to assert the instant claims.

Because there are triable issues of fact as to Plaintiffs' proposed market definition based on the *Brown Shoe* factors, the Court does not address the applicability of a single out-of-circuit decision. Because eBay has not challenged the Named Plaintiffs' standing other than within the *Whole Foods* context, that issue is moot.

15

market power.").

### (3)    Barriers to Entry

Plaintiffs assert that there are significant barriers to entry to the online auctions market because of network effects. eBay does not contest this assertion.

### b.    Causal Antitrust Injury

To survive summary judgment on the issue of causal antitrust injury, Plaintiffs must "offer some evidence demonstrating the existence of an antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Forsyth*, 114 F.3d at 1477 (internal citations and quotations marks omitted). eBay claims that Plaintiffs have failed to present any such evidence.

Plaintiffs allege that they have suffered antitrust injury through eBay's charging of "supracompetitive" fees for its online auction platform. (*See* Consol. Class Action Compl. ("Compl.") ¶ 128 ("EBay auction sellers have paid or are likely to pay artificially inflated and supra-competitive fees."); Dec. 1, 2009, Oral Arg. Trans. 105:16-20 ("THE COURT: BUT THE BOTTOM LINE IS THAT THE CUSTOMER IS PAYING MORE THAN THE CUSTOMER SHOULD BY VIRTUE OF THE MONOPOLISTIC POSITION[?] [PLAINTIFFS' COUNSEL] MR. SAMPSON:  THAT IS THE ESSENCE OF AN OVERCHARGE CASE.  THIS IS AN OVERCHARGE CASE.").)

As a preliminary matter, the parties disagree over the appropriate measure of injury in a two-sided market such as eBay's. Consistent with their theory of recovery, Plaintiffs contend that the appropriate measure of damage is the alleged overcharge itself–that is, "the difference between the price paid for goods actually purchased and the price that would have been paid absent the illegal conduct." (Pls.' Reply in Support of Class Certification Mot. ("Pls.' Class Cert. Reply") 17 (citing 2 Phillip E. Areeda, Herbert Hovenkamp & Robert D. Blair, Antitrust Law ¶ 394, at 521 (2d ed. 2000)).) Plaintiffs point to the Third Circuit's statement in *Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.* ("*Dentsply*"), that "the standard method of measuring damages in price enhancement cases is overcharge, not lost profits." 424 F.3d 363,

374 (3d Cir. 2005).

eBay maintains that overcharge is not the appropriate measure of injury and that the Court should look instead to seller profit. eBay argues that unlike the one-sided market scenario considered in *Dentsply* and the cases cited therein, "in a two-sided market such as eBay's seller platform, changes to eBay's fee structure affect more than just the charge imposed on customers; there is no dispute that the level of eBay's fees determines what goods are listed, how quickly they sell and at what price they sell." (Def.'s MSJ Reply 7.) eBay cites two antitrust tying cases, *Kypta v. McDonald's Corp.*, 671 F.2d 1282 (11th Cir. 1982), *cert. denied*, 459 U.S. 857 (1982), and *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955 (1972), in support of its position. Explaining the *Siegel* court's holding, which it then applied to the facts before it, the *Kypta* court opined that:

> *Siegel*, then, stands for the proposition that injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value. The rationale behind this requirement is apparent: A determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the franchisor for the tying product. Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no injury can be claimed; suit, then, would be foreclosed.

*Kypta*, 671 F.2d at 1285. While recognizing that the instant case does not involve tying, eBay contends that *Kypta* and *Siegel* are relevant because they stand for the proposition that "when an antitrust plaintiff complains about the effects that flow from an allegedly anticompetitive act, injury is determined by the net effect of the act." (Def.'s MSJ Reply 8.)

While Plaintiffs contend that the same standard that courts routinely have applied in one-sided markets should apply to eBay's two-sided market, both parties acknowledged at oral argument that there is no case law that addresses directly the issue presented here. As the Third Circuit recognized in *Dentsply*, "[a] court might potentially use a lost profits measure of damages, as '[t]he Supreme Court has not explicitly held that any particular measure of damages is required or precluded.'" 424 F.3d at 374 (citing ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 184 (1996)). Ultimately, however, this Court

need not decide which measure of damages is appropriate here, because even assuming *arguendo* that overcharge is the correct measure, Plaintiffs have failed to raise a triable issue of fact as to whether they have been injured by eBay's alleged anticompetitive acts.

In their opposition to eBay's motion for summary judgment, Plaintiffs incorporate by reference their discussion of antitrust injury in their class certification motion and reply, together with Woroch's declarations in support of that motion. Plaintiffs emphasize repeatedly–and correctly–that in seeking class certification they "are not required to present completed damages models at the class certification stage, but merely [to] present a plausible methodology by which they will demonstrate impact on a common basis to the class." (Pls.' Class Cert. Reply 11:26-28 (citing *In re Diamonds Antitrust Litig.*, 167 F.R.D. 374, 384 (9th Cir. 1996)); see also Pls.' Class Cert. Motion 42:11-13 (citing *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 652 (N.D. Cal. 2007) ("It is not necessary that plaintiffs show that their expert's methods will work with certainty at this time. Rather, plaintiffs' burden is to present the court with a likely method for determining class damages."))). However, to defeat eBay's motion for summary judgment, Plaintiffs still must point to admissible evidence that would permit a reasonable jury to find that they have suffered injury that was caused by eBay's alleged anticompetitive acts. Plaintiffs' proffered evidence of causal antitrust injury consists entirely of the two models Woroch offered in support of their motion for class certification.

### i. Dominant-firm Model Entry Deterrence with Network Externalities Model

Using Woroch's first method, "antitrust impact may be measured through a dominant-firm model entry deterrence with network externalities model, where eBay's alleged anti-competitive actions have the effect of reducing competitive threats, enabling eBay to raise its fees (as reflected in its rate cards)." (Pls.' Mot. for Class Cert. 41 (citing Woroch Class Cert. Decl. ¶¶ 8, 73-80).) According to Plaintiffs, "[t]he key insight of the [deferred entry] model is the tradeoff facing the dominant firm between current price level and future entry." (Pls. Class Cert. Reply 11.) Woroch proposes that the model can "determine impact on class members by

comparing eBay's actual fees with fees it would have charged if it faced competitive threats

unencumbered by the anticompetitive actions." (Woroch Class Cert. Decl. ¶ 77.)

However, while Woroch describes how his first model might work in theory, Plaintiffs

make no attempt anywhere in their briefing to show that the model actually works *in practice* in

this case and would permit a reasonable jury to conclude that Plaintiffs have been injured as a

result of eBay's alleged anticompetitive acts.  To the contrary, Woroch concludes the section of

his declaration discussing this model with the following paragraph:

> To fit a dominant-firm model of entry deterrence to the facts of the online
> auction market *would require* rather detailed data.  Detailed figures on the listings
> and transactions by eBay and by its active competitors *would be needed* along
> with complete fee structure over the sample period.  It is possible, however, to
> characterize this equilibrium with access to reliable estimates of buyer and seller
> behavior, such as the price elasticity of auction listings.

(Woroch Class Cert. Decl. ¶ 80 (emphasis added).)  While Plaintiffs claim in their class

certification papers that they did not "have the requested transactional data important to populate

Plaintiffs' models" at the time they filed their motion  (Pls.' Class Cert. Reply 13), they do not

contend at any point in their opposition to the motion for summary judgment, nor did they

indicate at oral argument, that they lack sufficient data with respect to Woroch's first model to

raise a triable issue of fact as to causal antitrust injury.

### ii.    Reduced-form Treatment Effects Regression Model

Woroch's second method of determining antitrust injury is "a reduced-form treatment

effects regression model [which] relat[es] eBay's auction 'take rates' to market conditions,

comparing the take rates under different degrees of anti-competitive conduct during the class

period." (Pls.' Class Cert. Mot. 41 (citing Woroch Class Cert. Decl. ¶¶ 8, 81-86).)  The term

"take rate" refers to "eBay's revenues as a percentage of total merchandise sold using eBay.com"

and is used by Woroch as "a proxy for the amount of seller overcharge experienced by members

of the class." (Pls.' Class Cert. Reply 10.)  Woroch proposes that the model can determine how

much sellers were overcharged by eBay as a result of one or more of its anticompetitive acts by

comparing the actual take rate with the take rate in a "but-for world" in which eBay did not

engage in these acts. Plaintiffs offer several specific examples based on the available data, including one that purports to demonstrate the overcharge associated with eBay's acquisition of PayPal. (*See id.* (citing Woroch Class Cert. Reply Decl. ¶¶ 19-20; Ex. 1).)

Plaintiffs devote several paragraphs of their class certification reply brief to lauding the merits of regression analysis in antitrust cases. However, the problem with Woroch's second model is not its general methodology but what the model purports to show. As discussed above, Plaintiffs' theory of causal antitrust injury is that they were injured by paying supracompetitive fees, or, in other words, by being "overcharged" by eBay for its services. Woroch's model explicitly uses take rate as a proxy for overcharge. Take rate, however:

> although a measure of fees collected by eBay across all transactions, is not actually a measure of the fee paid by any of the three Named Plaintiffs or any class member. eBay's take rate is determined by the volume of the goods sold on its site, the number of total listings, the number of successful listings, the features that sellers use to present their listings to potential buyers, and its rate schedule. Of these, only the last is of antitrust interest.

(Def.'s MSJ Reply 7.) There is no material dispute that take rate "can move up as eBay sellers add features to their listings in pursuit of higher average selling prices" or "if listings increase more rapidly than successful listings." (Def.'s MSJ Reply 5.) Even assuming that Woroch's model shows an increase in take rate following an allegedly anticompetitive act by eBay, the model cannot–nor is it designed to–determine whether that increase resulted from an increase in fees or the imposition of supracompetitive fees.

eBay's expert, Dr. Robert Topel ("Topel"), explains this problem as follows:

> [T]he Take Rate is affected by sell-through rates–the fraction of listed goods that actually sell. Lower sell-through rates raise the Take Rate by reducing the average sale value per listing, even if fees are unchanged. Sell through rates, in turn, are influenced by sellers' own decisions. If these changes are correlated with the existence of challenged [that is, alleged anticompetitive] acts, then Professor Woroch's analysis will attribute impact to acts even if there is none.
>
> The Take Rate also increases when the average selling price for completed transactions declines, holding the levels and structure of the fees constant. If a challenged act had no anticompetitive impact on fees, but attracted more low-value items to the platform, then this association would also wrongly attribute an anticompetitive impact to the act.

(Topel Class Cert. Decl. ¶¶ 139-40.)

In response to Topel's declaration, Woroch makes the following statement:

> Dr. Topel does raise the possibility that the discrepancy between the rate card [i.e., the fees charged to eBay sellers] and take rate could be correlated with [average selling price] or with the sell through rate which, in turn, are related to the challenged act(s). Accepting for the moment that take rate is a proxy for antitrust impact, and that it is subject to such measurement error, standard techniques exist for avoiding bias that could arise as a result of correlation. The correlation that arises between an explanatory variable is a very common occurrence in applied econometrics. Perhaps the most popular remedy is to perform 'instrumental variable estimation.' Use of a good instrument will accommodate correlation that arises between the included indicators of the anticompetitive acts and the error term in the regression.

(Woroch Class Cert. Reply Decl. ¶ 25.)

Woroch's response highlights the problems with Plaintiffs' attempt to show antitrust injury. First, Woroch responds to the criticism that he is using take rate as a proxy for anticompetitive injury with an explanation that assumes the same proxy. Second, as is the case with his first model, Woroch merely describes how he might use econometric techniques to reduce the error rate. While such a hypothetical analysis might be sufficient to meet the "plausible methodology" standard required for class certification, it is too indefinite and speculative to enable Plaintiffs to survive summary judgment.

Despite Plaintiffs' repeated assertion that a class certification motion is not the appropriate forum for a "battle of the experts," Plaintiffs and their expert devote an inordinate number of pages in their class certification reply to challenging Topel's theories and opinions. However, even if Topel's analysis is flawed, that fact does not help Plaintiffs carry their burden on summary judgment. Despite the voluminous briefing permitted in connection with both of the instant motions–which includes hundreds of pages of supporting documents–Plaintiffs have not drawn the Court's attention to any actual proof of antitrust injury caused by eBay's alleged anticompetive acts–on an individual or a classwide level. It is undisputed that Woroch's model does not measure fees, or at the very least does not measure them alone. His comparison between actual take rate and take rate in the but-for world thus is insufficient to permit a jury to determine whether the Plaintiffs were overcharged as a result of eBay's alleged anticompetitive acts. Absent any probative evidence as to this element of Plaintiffs' antitrust claims, eBay is

21

entitled to summary judgment.

**2.      Monopolization and Attempted Monopolization of the Person-to-Person**

**Online Payment Market**

The foregoing discussion of causal antitrust injury applies equally to Plaintiffs' claims for monopolization and attempted monopolization of the P2P online payment market.

**3.      State Law Claims**

As Plaintiffs acknowledge in their motion for class certification, "[t]he analysis under California's antitrust law mirrors the analysis under federal law." (Pls.' Class Cert. Mot. 43 (citing *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)).) As Plaintiffs' state law claims are predicated on violations of the federal antitrust laws, eBay is entitled to summary judgment on these claims as well.

**B.      Motion for Class Certification**

In light of the disposition of the motion for summary judgment, Plaintiffs' motion for class certification is moot.

**III. ORDER**

The motion for summary judgment will be granted.  The motion for class certification will be denied as moot.  Judgment will be entered accordingly.

**IT IS SO ORDERED.**

DATED: March 4, 2010

_____
JEREMY FOGEL
United States District Judge

Case No. C 07-01882  JF (RS)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
(JFLC3)